IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>$196,280.00 IN U.S. CURRENCY,<br><br>*Defendant in Rem.* | No. 3:23-CV-2857 |

## VERIFIED COMPLAINT FOR FORFEITURE IN REM

Pursuant to Supplemental Rule G(2) of the Federal Rules of Civil Procedure, the United States of America alleges this *in rem* complaint for forfeiture against $196,280.00 in U.S. Currency (the "Defendant Property"):

## NATURE OF THE ACTION

1.      This is a forfeiture action under 21 U.S.C. § 881(a)(6), 18 U.S.C. § 981(a)(1)(C), and/or 18 U.S.C. § 981(a)(1)(A).  The United States seeks the forfeiture of the Defendant Property because it is money furnished by any person in exchange for a controlled substance, proceeds traceable to such an exchange, and/or property intended to facilitate such an exchange in violation of 21 U.S.C. §§ 841(a) and/or 846.  The Defendant Property is also subject to forfeiture under 18 U.S.C. § 981(a)(1)(C) because it is property which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1952, a specified unlawful activity as defined in 18 U.S.C. §§ 1957(c)(7) and

1961(1).  The Defendant Property is also subject to forfeiture because the property was involved in, or traceable to property involved in money laundering, or conspiracy to do so, in violation of 18 U.S.C. § 1956 and/or 18 U.S.C. § 1957.  The Defendant Property is also subject to forfeiture as proceeds traceable to, involved in, and/or property intended to facilitate such an exchange, of an unlicensed money transmitting business, in violation of 18 U.S.C. § 1960.

<u>**JURISDICTION AND VENUE**</u>

2.      This Court has subject matter jurisdiction over this matter under 28 U.S.C. §§ 1345 and 1355(a), and in rem jurisdiction is proper under 28 U.S.C. § 1355(b).

3.      Venue in this Court is proper under 28 U.S.C. §§ 1355(b)(1)(A) and 1391(b), because acts or omissions giving rise to the forfeiture occurred in the Northern District of Texas and a substantial part of the events giving rise to the forfeiture occurred in the Northern District of Texas.

<u>**PARTIES**</u>

4.      The Plaintiff is the United States of America.

5.      The Defendant Property is $196,280.00 in U.S. currency.

6.      The Defendant Property was seized at DFW Airport, Texas, on July 1, 2023 from Matthew Burden, and is currently in the custody and control of the United States Marshals Service in the Northern District of Texas.  Matthew Burden, represented by Kirk F. Lechtenberger, and Adriana Jones, represented by Michael Elsner and Samuel

Mitchell, filed an administrative claim to the $196,280.00 in the Drug Enforcement Administration's administrative forfeiture proceeding.

## FACTS

7.      On July 1, 2023, Special Agent ("SA") Andrew Woeppel of the Task Force received information from Minneapolis DO Task Force Officer ("TFO") Michell Irvin that Matthew Burden ("Burden") was traveling from Minneapolis, MN to Dallas, TX and was carrying approximately $200,000.00 in U.S. Currency in his carry-on bag.  TFO Irvin stated that Burden had purchased a ticket for travel the same day and would be traveling on American Airlines flight 2409.  TFO Irvin also provided a brief physical description of Burden and Burden's seat number.

8.      At about 9:15 P.M., SA Woeppel and Prosper Police Department Officer Brian Durden and his canine partner, Swayze, arrived at gate B9 in DFW Airport where American Airlines flight 2409 was due to arrive.  SA Woeppel, Officer Durden, and Swayze positioned themselves at the end of a long hallway which was located between the jet bridge and the terminal's waiting area.

9.      At about 9:30 P.M., American Airlines flight 2409 arrived and passengers began exiting the plane.  Soon after passengers began exiting the plane, SA Woeppel observed an individual matching Burden's description turn the corner from the jet bridge to the hallway where SA Woeppel, Officer Durden, and Swayze had placed themselves.

10.     Burden walked up to SA Woeppel and said, "Are you looking for me?"  SA Woeppel then asked Burden to see his boarding pass and identification.  SA Woeppel

confirmed Burden's identity via his Texas State driver's license and returned it to
Burden.

11.     SA Woeppel asked Burden if he could speak to Burden about his travels
and Burden agreed.  Both SA Woeppel and Officer Durden did not block Burden's path
to the terminal's waiting area, and Officer Durden remained several feet behind SA
Woeppel and Burden.

12.     SA Woeppel asked Burden if he packed his own bags.  SA Woeppel also
asked Burden if anyone gave him anything to carry in his bags such as weapons or
dangerous or sharp objects.  Burden said he was not carrying such items.

13.     Burden then told SA Woeppel that he was carrying money in his bag.  SA
Woeppel asked if he could see the money and Burden agreed.

14.     Burden placed his carry-on bag, a black duffle bag, on the ground at SA
Woeppel's feet.  At this time, Officer Durden, who was observing the encounter, noticed
Burden's demeanor appeared extremely nervous.

15.     SA Woeppel retrieved the money, which was at the bottom of Burden's
carry-on under clothing and other personal items.  The money was wrapped in three (3)
yellow envelopes.  SA Woeppel removed the envelopes and placed them on the opposite
wall on the side of the terminal's waiting area and continued the interview.

16.     Burden state that he had been in Minneapolis for two days and he lived in
Frisco, TX.  He also stated he was in the private security business.

17.    When SA Woeppel asked Burden where he obtained the money, Burden said he was hired to carry the money as a part of his job in private security.  He said his company was "discreet".  Burden also stated he worked for "the DoD" in the past, but the name of his current company was Blackthorn.

18.    SA Woeppel asked Burden who hired him to carry the money and Burden said an individual named Jesse Abbott hired him.  Burden could not provide any other details about Abbott other than he lived in Minneapolis and that he was probably the same age as Burden and SA Woeppel.

19.    SA Woeppel asked Burden if he was a certified money courier in Texas and Burden said he was not.

20.    Burden said he picked up the money at the bank the same day of his travel, July 1, 2023.  He also said the money was to purchase land in Elgin, OK.

21.    Burden then handed SA Woeppel a letter of certification from Vermillion State Bank.  The letter stated that Twin Cities Capital had authorized Burden to carry the money to William Thomas of Blackthorn Alliance located in Dallas, TX, for the purchase of the land in Elgin, OK.  The letter stated the amount of money being carried was $200,550.00.  The letter also contained several signatures and was dated July 1, 2023.

22.    SA Woeppel asked Burden if there was any other information on his cellular phone that could confirm the relationship between Burden, Blackthorn, Twin Cities, or Abbott.  Burden said there was not any information confirming any relationship

between the parties.  SA Woeppel then asked if they could call Abbott regarding the transportation of the money and Burden said they could not.

23.     During the course of the interview, Burden stated that the money was related to "cannabis" and it was going to be used to purchase the land in Oklahoma.

24.     During the interview, Officer Durden deployed Swayze, a certified narcotics canine, on the envelopes of money.  Officer Durden indicated that Swayze alerted on the envelopes and destroyed an envelope.  The currency that was inside the destroyed envelope was bills in $100 and $20 denominations, which is consistent with narcotics trafficking.

25.     Based on the information, interview, and the certified narcotics canine Swayze's alert on Burden's money, SA Woeppel told Burden the money would be seized as suspected drug proceeds.

26.     Burden then told SA Woeppel he would have to provide the necessary information for the forfeiture process.  SA Woeppel asked Burden if he had money seized in the past.  Burden said he had money seized three times before and had received the money back after "lawyers were involved."

27.     SA Woeppel said Burden would need to give SA Woeppel and Officer Durden information to notice any parties involved, including Abbott's information because Abbott may have been the owner of the money.  Burden provided his own contact information, and he also provided an email address for Abbott.

28.     SA Woeppel thanked Burden for his cooperation and gave him a copy of a receipt for the money seized as witnessed by Officer Durden.  At this time, Burden told SA Woeppel he had recorded the interview on his phone and proceeded to the terminal's waiting area.

29.     After the interview, SA Woeppel and Officer Durden transported the money to the Dallas Field Division for processing.

30.     On July 3, 2023, SA Woeppel contacted the security officer at Vermillion State Bank.  He also spoke to Jake Poepl, whose name appeared on the letter of certification Burden provided.  Poepl stated he did not sign or issue the letter and that such a large withdrawal with an accompanying letter would be unusual.  After speaking with Poepl, SA Woeppel concluded that the letter Burden provided was fictitious.

31.     On July 6, 2023, a final count of the money seized from Burden was obtained.  The final count was $196,280.00 and not $200,550.00 as the Vermillion State Bank letter stated.  The final count consisted of $1 bills, $5 bills, $20 bills, $50 bills, and $100 bills.  Smaller bills would be highly unlikely to be included in a legitimate bank withdrawal.

32.     SA Woeppel later received intelligence that Abbott would be traveling from Minneapolis to Dallas, TX on August 1, 2023.  This intelligence was passed along to TFO Irvin who was able to interview Abbott before he boarded his flight.  During this

interview, Abbott stated that he was going to be acting in a film about marijuana and consented to a search of his bags.

33.     On October 23, 2023, SA Woeppel and Investigative Analyst ("IA") Moira McIntyre conducted a telephone interview with William Thomas regarding Burden's activities.  Thomas stated he is the principle of Blackthorn Alliance and that he was notified via mail that the money had been seized from Burden.  Thomas stated that neither he nor Blackthorn was involved in any criminal activity.  Thomas stated that Burden was taking advantage of his position at Blackthorn to engage in criminal activity.

### FIRST CAUSE OF ACTION
**21 U.S.C. § 881(a)(6)**
**(forfeiture of property related to drug trafficking)**

34.     The United States reasserts all allegations previously made.

35.     Under 21 U.S.C. § 881(a)(6), "moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of" 21 U.S.C. § 801 et seq. are subject to forfeiture.

36.     Under 21 U.S.C. § 841(a), it is "unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to

manufacture, distribute, or dispense, a controlled substance."  An attempt or conspiracy to do the same is also prohibited by 21 U.S.C. § 846.

37.     As set forth above, the Defendant Property is moneys furnished by any person in exchange for a controlled substance, proceeds traceable to such an exchange, and/or property intended to facilitate such an exchange in violation of 21 U.S.C. §§ 841(a) and/or 846.  This property is therefore subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

## SECOND CAUSE OF ACTION
### 18 U.S.C. § 981(a)(1)(C)
### (forfeiture related to violation of the Travel Act)

38.     The United States reasserts all allegations previously made.

39.     Under 18 U.S.C. § 981(a)(l)(C), any property which constitutes or is derived from proceeds traceable to an offense constituting a "specified  unlawful activity," or a conspiracy to commit such offense, is subject to forfeiture to the United States.

40.     Under 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1), interstate travel or transportation in aid of racketeering enterprises in violation of 18 U.S.C. § 1952 is a specified unlawful activity.

41.     18 U.S.C. § 1952(a) prohibits, inter alia, any individual who uses "any facility in interstate or foreign commerce,":

with the intent to –

(1) distribute the proceeds of any unlawful activity; or [ ]
(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity"

from thereafter performing or attempting to perform the conduct described in subparagraphs (1) and (3) above.

42.    18 U.S.C. § 1952(b) specifically includes within the definition of "unlawful activity" "any business enterprise involving . . . narcotics or controlled substances (as defined in section 102(6) of the Controlled Substances Act)."

43.    As set forth above, the Defendant Property is property which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1952. This property is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(l)(C).

**THIRD CAUSE OF ACTION**
**18 U.S.C. § 981(a)(1)(A)**
**(forfeiture related to money laundering)**

44.    The United States reasserts all allegations previously made.

45.    Under 18 U.S.C. § 981(a)(l)(A), any property which was involved in, or traceable to property involved in money laundering, is subject to forfeiture to the United States.

46.    18 U.S.C. § 1956 prohibits any individual, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, from conducting or attempted to conduct a financial transaction which involves the proceeds of specified unlawful activity:

with the intent to –

      (A)(i) promote the carrying of specified unlawful activity; or []; or

      (B) knowing that the transaction is designed in whole or in part –
           (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or
           (ii) to avoid a transaction reporting requirement under State or Federal law.

47.    18 U.S.C. § 1957 prohibits any individual from knowingly engaging or attempting to engage in a monetary transaction in criminally derived proceeds of a value greater than $10,000 and is derived from specified unlawful activity.

48.    As set forth above, the Defendant Property is property which is involved in, or traceable to property involved in, money laundering in violation of 18 U.S.C. §§ 1956 and/or 1957.  This property is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(l)(A).

**FOURTH CAUSE OF ACTION**
**18 U.S.C. §§ 981(a)(1)(C), 981(a)(1)(A)**
**(forfeiture related to unlicensed money transmitting business)**

49.    The United States reasserts all allegations previously made.

50.    Under 18 U.S.C. § 981(a)(l)(C), any property which constitutes or is derived from proceeds traceable to an offense constituting a "specified  unlawful activity," or a conspiracy to commit such offense, is subject to forfeiture to the United States.

51.     Under 18 U.S.C. § 981(a)(1)(A), any property that is involved in, facilitates, or is traceable to such property of an offense constituting an unlicensed money transmitting business, is subject to forfeiture.

52.     18 U.S.C. § 1960(a) prohibits an individual from knowingly conducting, controlling, managing, supervising, directing, or owning all or part of an unlicensed money transmitting business.

53.     18 U.S.C. § 1960(b) provides the definitions for unlicensed money transmitting business.

54.     As set forth above, the Defendant Property is property which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1960, and/or involved the offense or facilitates the offense.  This property is therefore subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(l)(C) and/or 981(a)(1)(A).

## **REQUEST FOR RELIEF**

WHEREFORE, the United States respectfully asserts that the Defendant Property is forfeitable to the United States under 21 U.S.C. § 881(a)(6), 18 U.S.C. § 981(a)(1)(C), and/or 18 U.S.C. § 981(a)(1)(A).

The United States further requests:

A.     Publication of notice of this forfeiture action be made by posting notice on the official government internet site, www.forfeiture.gov, for at least 30 consecutive days, in accordance with Supplemental Rule G(4)(a)-(5).

B.     Direct notice of this forfeiture action be given to those

Page **12** of **15**

persons who reasonably appear to be potential claimants in accordance

with Supplemental Rule G(4)(b)-(5).

C.      In order to avoid forfeiture of the Defendant Property, all persons

having any interest in or right against the defendant property be advised by the

public notice or the direct notice to timely file in this court a verified claim

identifying the interest or right to the defendant property as required by

Supplemental Rule G(5)(a) and 18 U.S.C. § 983(a)(4)(A); and to file an

answer to this Complaint for Forfeiture or motion under Fed. R. Civ. P. 12 in the

manner required by the Supplemental Rule G(5)(b) and 18 U.S.C. § 983(a)(4)(B).

Further, any person filing a verified claim of interest or right and/or an answer shall

serve a copy on Dimitri N. Rocha, Assistant United States Attorney, 1100 Commerce

Street, Suite 300, Dallas, Texas 75242.

D.      Pursuant to Rule G(5)(a), the claim must (A) identify the

specific property claimed; (B) identify the claimant and state the claimant's

interest in the property, and (C) be signed by the claimant under penalty of

perjury.  Any person who asserts an interest in the Defendant Property must

filed a verified claim within 35 days after the date the notice is sent if the

notice is delivered by mail, or within 35 days of the date of delivery if the

notice is personally served and not sent by mail.

E.      Any person who files a verified claim must then file an

answer to the complaint or a motion under Rule 12 within 21 days after

filing the verified claim.

F.      At the conclusion of this proceeding, the defendant property be condemned by order and judgment of this court and declared and decreed to be forfeited to the United States of America in accordance with law.

G.      All costs and expenses incurred by the United States in obtaining the forfeiture of the defendant property be appropriately taxed against any person or entity who may file a verified claim and answer herein, and/or if more than one person or entity files a verified claim and answer herein be jointly taxed and prorated among them, as the court deems just and equitable.

H.      The United States have such other and further relief, at law or in equity, to which it may show itself justly entitled.

DATED this 27th day of December 2023.

LEIGHA SIMONTON
UNITED STATES ATTORNEY


*/s/ Dimitri N. Rocha*
Dimitri N. Rocha
Assistant United States Attorney
Florida State Bar No. 693332
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
T: 214-659-8650 | F: 214-659-8803
dimitri.rocha@usdoj.gov

ATTORNEY FOR PLAINTIFF

## **VERIFICATION**

I am a Special Agent (SA) with the Drug Enforcement Administration (DEA).  As a SA with the DEA, my duties and responsibilities include participating in the investigation and prosecution of persons who violate federal laws.

I have read the contents of the foregoing Complaint for Forfeiture *In Rem* and verify under penalty of perjury pursuant to 28 U.S.C. § 1746 that the factual statements contained therein are true and correct to the best of my knowledge and belief.

Executed on this 26th day of December 2023.


_____
Andrew Woeppel, SA
Drug Enforcement Administration